YOUNG, C.J.
(concurring in part and dissenting in part). We concur with and join parts I, II, 111(A), and 111(B)(1) of Justice Mary Beth Kelly’s opinion. We agree with Justices MARY BETH KELLY and MARKMAN that actual compliance with the statutory type requirements is mandated. In determining how to measure the type size, we believe that the technical (namely, the customary printer’s) understanding of the statutory terms “type” and “point” negate the intervernor’s notion that one can determine the size of “type” by measuring the characters actually printed. Consequently, the question we must resolve is whether the “size 14” Calibri font generated by plaintiffs computer is a faithful replication of the statutorily required heading in 14-point type that would have been generated by using traditional movable type.
On this question, Justice MARY BETH KELLY believes that it is possible on this record, and with reference to extrarecord materials, both to determine how a digitized computer font is produced and that the font at issue here meets the statutory size requirement. She does so by invoking judicial notice. We do not share Justice MARY Beth Kelly’s technical literacy: we lack the necessary knowledge of printing and, more important, the programming necessary to create computer fonts. Therefore, we respectfully dissent from her conclusion that plaintiff actually complied with the type size requirements in MCL 168.482(2).
*621 As a result, we conclude that plaintiff failed to establish that its petition heading met the statutory type and print requirements. Because of this failure of proofs, we would deny plaintiffs claim for mandamus, thus reversing the Court of Appeals’ decision on the merits. However, given the stunning transformation of the printing industry since the statutory requirements were enacted — from movable type to computer generated print — and because we believe that the historical statutory terms are nonetheless applicable in this new computer era, it is important for this Court to establish a precedent to guide future petition efforts. While we reject her conclusion that actual compliance has been proved here, we believe that Justice MARY BETH Kelly’s opinion has provided this guidance on the controlling legal principles.
Important to our resolution of this case, however, is the fact that the legal standards under which the Secretary of State, the Board of State Canvassers, and the parties operated were confused and, as held today, erroneous. As a consequence, we would allow plaintiff an opportunity to present proofs to the Board of State Canvassers under the announced correct legal standards. Accordingly, we would remand this case to the Board of State Canvassers for further proceedings to determine whether plaintiffs petition heading actually complied with the type size requirements of MCL 168.482(2).
As eloquently stated by Justice MARY BETH KELLY, this appeal concerns a big constitutional issue about an apparently small thing: the size of a heading required for circulated petitions like the one at issue here. And although a “technical” requirement — the size of a petition heading — is involved, this is a legally and constitutionally significant matter because compliance with the *622 legal petition requirements is the only means by which a small fraction of Michigan citizens is permitted to countermand the will of the people as expressed through the legislation duly enacted by their elected representatives.
So this case about a “technicality” is not about the wisdom of the act the plaintiffs petition seeks to suspend, nor is it about “the people’s right to vote,” as plaintiff characterizes the issue. The fact is, the people have voted: they elected the very Legislature and Governor who enacted the emergency financial manager act, 2011 PA 4, MCL 141.1501 et seq., that plaintiff challenges with its petition.
The sole question before us is whether plaintiff has filed a qualifying, legally compliant petition that permits it to both suspend this validly enacted law and require its members’ fellow citizens to determine whether this law will remain on the books. As Justice Mary Beth Kelly explains, this is a core issue in a constitutional republic like ours.
I. ANALYSIS
A. THE JUDGE-MADE “SUBSTANTIAL COMPLIANCE” DOCTRINE, TO THE EXTENT THAT IT REMAINS VIABLE, IS SUPERSEDED HERE BY THE LEGISLATIVELY DEFINED SUBSTANTIAL COMPLIANCE PROVISION OF MCL 168.544d.
MCL 168.482(2) requires that the petition heading “shall be . . . printed in capital letters in 14-point boldfaced type[.]” A majority of the Court agrees that, for the reasons that Justice MARY BETH Kelly’s and Justice MARKMAN’s separate opinions explain, the judge-made doctrine of substantial compliance is insufficient to entitle plaintiff to certification of its petition. Because MCL 168.482(2) uses the mandatory language “shall” regarding the type size of the petition heading, plaintiff *623 must fully adhere to this provision unless another statutory provision specifically allows for substantial compliance. As Justices MARY BETH KELLY and MARKMAN correctly explain, there is no statutory provision that would allow the Board of State Canvassers to apply the doctrine of substantial compliance to plaintiffs petition in this case. In particular, MCL 168.544d incorporates a substantial compliance provision specifying that only the Secretary of State may prescribe forms that substantially comply with the statutory requirements for petitions.
In this case, the Secretary of State actually mandated compliance with the required statutory conditions,[1] and plaintiff cannot prevail on the ground that it “substantially complied” with the 14-point type requirement. Thus, unless plaintiff actually complied, there is no clear legal right to have its petition certified.
B. THE MANDATORY STATUTORY “POINT” SIZE REQUIREMENTS FOR “TYPE” REFER TO THE SIZE OF A TRADITIONAL MOVABLE TYPE BLOCK, NOT THE SIZE OF THE ACTUAL PRINTED CHARACTER ON THE PETITION.
We agree with Justice MARY BETH KELLY that the Court of Appeals panel erred to the extent that it concluded that the petition heading’s printed letters themselves must measure 14 points in height. While the Court of Appeals panel correctly recognized that a point is a unit of measurement (approximating V72 of an *624 inch), the definitions of “point” and “type” that predominated at the time the Legislature enacted MCL 168.482 belie the conclusion that the printed letters themselves must measure 14 points in height.
The Legislature enacted MCL 168.482 in 1954 and amended it in 1965 to provide that the heading “shall be... printed in capital letters in 14-point bold face type[.]”[2] In determining the meanings of “point” and “type,” this Court must accord these terms their “peculiar and appropriate meaning[s]” at the time of enactment.[3]
Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948) defines “type” as “[a] rectangular block, usually of metal or wood, having its face so shaped as to produce, in printing, a letter, figure, or other character” or, alternatively, as “[s]uch blocks, or the letters or characters impressed, collectively.”[4] It defines “point system” specifically in relation to the blocks themselves: “A system according to which the various sizes of type bodies, leads, etc., bear a fixed and simple relation to one another. . . . The value of the point is .013837 inch, or nearly Vv2 inch.”[5]
*625 Importantly, the dictionary contains a diagram of type that shows that the type face, or raised portion of the type block that actually imprints the ink onto the paper, is somewhat smaller than the size of the type block itself. The following diagram of a type block, taken from a 1963 treatise on typography, similarly shows how the type face does not extend to the entire space of the printer’s block. Moreover, it shows that the point body of the type is measured by reference to the entire nrinter’s block.[6]
[[Image here]]
This is consistent with the print literature dating back to the turn of the last century. An early twentieth century technical treatise on type explains:
Only a few letters, like J and Q, cover nearly the entire surface on the end of the type; other letters, like B h 1 i, *626 cover the upper portion chiefly and leave a blank space at the bottom; while the small letters, like a e o u v, occupy only the middle portion of the surface; still others, like g y p, cover the middle and lower portions of the surface. As all these irregular shapes must be made to appear in line with each other, the type-body on which they are made is larger than the letter.[7]
Moreover, Webster’s Third New International Dictionary of the English Language (Unabridged) defines “point” by referring to an illustration of “type” that refers to the block’s “point size” as the entire length of the block, not just the raised portion that creates the printed character.
In short, there does not appear to be any dispute about the historical understanding of these technical printer’s terms.[8] These dictionary definitions and tech *627 nical sources show unequivocally that, “although the body size of metal type is consistent, the printed letters themselves vary in size. Since no individual letter fills the entire body, you can see why merely measuring the printed letter will not reveal the point size.”[9] Moreover, *628 because different type style families (now colloquially referred to as “fonts”) use the available space differently, “[d]ifferent typefaces having the same point size may appear larger or smaller . . . ,”[10] Therefore, plain *629 tiffs expert correctly explained at the hearing before the Board of State Canvassers that the space on the top of a printer’s block “ ‘becomes a canvas that a type designer gets to work with, and sometimes they use the whole canvas and sometimes they use part of the canvas.’ ”[11] Because type size incorporates some amount of additional space on the printer’s block, and because different type style families use that space differently, different sized letters result even when printed from blocks of the same size.
C. WHEN A PETITION IS PRINTED USING COMPUTER GENERATED FONTS, IN ORDER TO ESTABLISH COMPLIANCE WITH THE STATUTORY TYPE SIZE REQUIREMENT, THE PETITION’S PROPONENT MUST SHOW THAT THE FONT USED FAITHFULLY REPLICATES WHAT A TRADITIONAL TYPE BLOCK WOULD HAVE GENERATED.
While these definitions of “point” and “type” are clear based on their customary technical meanings, the confounding issue in this case is how to apply these historical definitions in an age when digital printing predominates. Contrary to Justice MARY BETH Kelly’s conclusion, we do not believe that the evidence available to us is sufficiently clear for this Court to take judicial notice that Microsoft’s digital fonts replicate the point measure that the Legislature intended. Because digital fonts do not use physical printer’s blocks, it is not self-evident that the system of digital fonts accurately replicates the movable type point system.[12] Plaintiffs *630 Calibri heading may well actually comply with the statutory 14-point type requirement. However, simply choosing a digital “size 14” font does not prove that it is equivalent to the 14-point type standard that the Legislature required when it enacted MCL 168.482.
In light of the fact that no one understood when the Board of State Canvassers held the hearing that plaintiff was obligated to establish this equivalency, it is not hard to understand why its proofs consisted of little more than an attestation that its printer faithfully selected “size 14” Calibri font on his computer. Similarly, this is the reason why Justice MARY BETH KELLY must look outside the record and employ “judicial notice” in order to supply this critical missing set of proofs. Given that the computer font used in a petition must faithfully replicate what a movable type of the required point size would have produced in order to satisfy “actual compliance,” we are hard pressed to understand how this equivalency could be established without evidence from Microsoft, the producer of the Calibri font used here, about not only how it programmed the font but whether it actually replicates what the traditional printer’s type block would have produced.
I do not believe that the pastiche of extrarecord evidence relied on by Justice MARY BETH KELLY establishes these necessary proofs. And if they do, we lack sufficient computer expertise to confirm it.[13]
*631 Rather, we believe that the proper application of the statutory type size requirement in the context of a digital font requires plaintiff to show that a digital font accurately replicates the results that the point system would have generated. If plaintiff can show that the digitized font system it used accurately replicates a 14-point sized type that the point system would have generated, then it would be entitled to have its petition certified as sufficient. However, only with this showing can we know whether plaintiffs “size 14” Calibri font actually satisfied the statutorily mandated 14-point type size under the traditional movable type point system.
Because plaintiff has not proven the connection between its “size 14” font and the statutorily required 14-point type size, we do not believe that it is entitled to mandamus. Therefore, we concur in the decision to reverse the Court of Appeals panel decision on the merits, but we dissent from the decision to grant mandamus. Nevertheless, because the question *632 whether the font system accurately reproduces what the point system would have produced has never been addressed and because a general substantial compliance rule erroneously had been recognized as a means of avoiding the actual requirements of this statute, we would permit a remand to the Board of State Canvassers to give plaintiff an opportunity to present proofs under the correct legal standard: that the digital font system actually replicates results that the movable type point system would have generated. Only upon such proof could plaintiff establish that the heading of its petition is in fact “14-point boldfaced type” as that phrase is properly understood.
ZAHRA, J., concurred with YOUNG, C.J.

 The Secretaiy of State, in its advisory designed to provide guidance to citizens engaged in the petition process, cited MCL 168.482(2) and explained that the heading “shall be printed in capital letters in 14-point boldface type on the left margin of the signature side of the sheet or at the top of the signature side of the sheet.” Secretaiy of State memorandum, Initiative and Referendum Petitions ■— Prescribed Format (revised June 2011). Of course, the Secretaiy of State has the authority to determine that “size 14,” “size 12,” or “size 8” computer fonts comply with the statutory type size requirements of MCL 168.482(2), (5), and (3), respectively.

 1954 PA 116; 1965 PA 312. 1993 PA 137 amended MCL 168.482 to divide it into subsections and substitute “boldface” for “bold face,” while 1998 PA 142 substituted “boldfaced” for “boldface.” Neither of these subsequent amendments altered the terms “point” or “type.”

 MCL 8.3a.

 Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948), def 17, p 2750. Similarly, Webster’s Third New International Dictionary of the English Language (Unabridged) defines “type” as “a usu[ally] metal, wood, or plastic rectangular block having on its face a relief character of which an inked impression will produce a printed character” or, alternatively, as “a printed impression from type[.]” Webster’s Third New International Dictionary of the English Language (Unabridged) (1966), defs 3a and 3f, p 2476.

 Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948), def 3, p 1904.

 Rosen, Type and Typography (New York: Reinhold Publishing Corp, 1963), p 16, available at <http://babel.hathitrust.org/cgi/ pt?id=mdp.39015047342434> (accessed August 2, 2012).

 Stewart, Type (Chicago: United Typothetae of America, 1918), pp 7-8.

 Justice Markman argues that printers employed other methods of printing in 1954, when this statute was first enacted, and some of these methods did not use movable type. This is certainly a true statement, but it does not gainsay that the terms “point” and “type” were rooted in the movable type process and have well-known fixed meanings as we have explained.
Thus, Justice Markman’s examples of other alternative printing methods that did not require movable metal type blocks misses the point. Even if one of the rivals to letterpress printing methods were entirely divorced from the use of movable type, had it been used in a petition and challenged on the ground that it did not comply with the 14-point requirement, the same legal question raised here would have been presented: Did the alternative printing method satisfy the 14-point requirement as points were commonly understood in the printing industry?
Justice Markman may find it hard to understand why the Legislature chose an indirect method of specifying the size of various print in petitions, but that is exactly what it did. And it did so by using technical terms of art in the printing field that have a longstanding and undisputed meaning. Justice Markman chooses to rely on some of those definitional meanings, such as the fact that a “point” measures x/72 of an inch. *627 However, he jettisons others (the fact that point size is measured by the printer block, not the size of the character that rests on top) to advance his “direct measure” theory that one must measure the actual printed letters. Justice Makkman is free to question the wisdom of this legislative choice, but he may not ignore it, nor may he pick and choose among the established technical definitions of the statutory terms.

 Craig, Scala & Bevington, Designing with Type (5th ed) (New York: Watson-Guptill Publications, 2006), p 17.
One thing is clear: the Legislature mandated, that the petition type used be of a certain point size, but it did not mandate that a particular style of printed character be used. And therein lies the problem. It appears that printed characters of a particular style can be larger or smaller than other styles in the same point size.
Today, a modern Legislature might mandate the size of petition printing by reference to “fonts” rather than “points.” And as the record in this case demonstrates, even fonts listed as being of the same size appear to be larger and smaller than one another depending on the style of font selected. Accordingly, a “direct measure” approach to sizing the printed characters such fonts produce would be no more productive than it is in measuring points.
Justice Markman nevertheless concludes that the statutory reference to 14-point type means that the actual printed character set must measure of an inch high when measured from the top of the ascender of a lowercase letter (such as “h”) to the bottom of the descender of a lowercase letter (such as “j”). He asks, how could the Legislature have made plainer this intention than by mandating “14-point boldfaced type”?
The Legislature used a commonly understood term, “point,” which was and is understood to refer not to the size of the character printed but the block on which the character that produces the printed image sat. Thus, even though “type” can refer to the printed characters produced from a block of movable type, the point measurement of “type” exists by reference to the underlying block of type, not to the printed “type.” The provenance of this definition is unchallenged. The Legislature need not have known precisely how printers designed 1ype in order to have understood the general orders of size in typography and that 14-point type was larger than 12-point *628 or 8-point type. It used each of these sizes in the petition requirements. Those who frequently used printed materials generated with traditional printing methods in 1954 — which would have included legislators, given that the Legislature had its own printing press — would have certainly understood the general notion of point sizing, in much the same way that most adults today are familiar with computer fonts, even if they know nothing about how those fonts were created.
The intervenor posits the claim that each individual letter must measure uhz of an inch. However, if the Legislature wanted more directly to mandate the size of the actual printed characters, it could easily have stated that “the letters of the petition heading shall be ‘X’ tall” or, if it wanted to use printer’s jargon, “the letters of the petition shall be 14 points in height.” It did neither, presumably in reliance on the printing traditions then extant. Moreover, this argument founders when considering the whole of MCL 168.482. Subsections (3) and (5) both contain type size requirements. However, unlike subsection (2), they contemplate that the required text may appear in both capital and lowercase letters, which by definition have varying physical sizes. Nevertheless, the Legislature chose to use in subsections (3) and (5) the same terms — “point” and “type” — that it used in subsection (2).

 Craig, Designing with Type, p 18. Thus, an E-scale ruler provides only an approximation of type size and not an exact measurement of type size. This is because an E-scale ruler only contains an example of one particular type style family among the multitude of various styles of type in use. To the extent that other type style families measure slightly differently than the E-scale’s example, the resulting E-scale measurement will not provide a precise determination of the type size shown.
Thus, contrary to the alternative method of measurement that the intervenor and Justice Markman urge be used for determining type size by directly measuring the printed characters, the Board of State Canvassers cannot measure the type size of the petition heading simply by comparing the letters on the petition heading to a 14-point capital “E.” Indeed, the most compelling evidence in the record that the E-scale ruler provides only approximate sizing of type is the affidavit of the intervenor’s own expert, who indicated that one of the example headings that had been printed using 14-point metal type measured “slightly larger” than the 14-point capital “E” on an E-scale ruler. Moreover, the existence *629 of variation between different type style families undermines Justice Markman’s claim that application of the “printer’s block” approach would not warrant a remand in this case.

 Stand Up For Democracy v Bd of State Canvassers, 297 Mich App 45, 57; 824 NW2d 220 (2012).

 Justice Markman’s detailed critique of Justice Mary Beth Kelly’s resort to inconclusive materials outside the record reinforces our belief *630 that this Court has no competency to make the kind of factual determination that was never addressed and certainly not provided in the record.

 Ordinarily, we judges take judicial notice of things that cannot be disputed, such as the state of the moon on a given date as reflected in an almanac. The cycles and phases of the moon are, after all, constant and predictable. How Microsoft programmed its font system seems well shy of the certainty level required for the application of judicial notice.
*631 If how Microsoft generated its font system and the question of its relationship to the sizing of traditional type blocks is not considered “technical” — outside the realm of common knowledge — then we are not sure what subject matter would qualify. Ordinarily, we judges rely on experts, not judicial notice, to resolve technical questions. For instance, MRE 201 allows a trial court to take judicial notice only of adjudicative facts that are “not subject to reasonable dispute” and that are either “generally known within the territorial jurisdiction of the trial court or ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.” MRE 201(b). The questions presented here clearly are not of the kind that would qualify under MRE 201. More telling, almost no justification is offered in support of the application of judicial notice that “size 14” Calibri font generates the same result that the applicable point system would have yielded. We do not know whether the Web sources that Justice Maky Beth Kelly relies on are “capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,” MRE 201, and she does not even assert that they meet this exacting standard.